UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VANESSA COWAN,

                              Plaintiff,

          -v-

THE CITY OF MOUNT VERNON, et al.,

                              Defendants.

Case No. 12-CV-6881(KMK)

OPINION & ORDER

Appearances

Benjamin Lewis Felcher Leavitt, Esq.
Leavitt Legal PLLC
White Plains, NY
*Counsel for Plaintiff*

Jessica Christine Moller, Esq.
Bond, Schoeneck & King, PLLC
Garden City, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Vanessa Cowan ("Plaintiff" or "Cowan") brings this Action against Defendants

The City of Mount Vernon (the "City"), DaMia Harris ("Harris"), and Hamp Miller ("Miller")

(collectively "Defendants"), alleging sexual harassment and retaliation in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the New York State

Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"), violations of the Equal

Protection Clause of the Fourteenth Amendment, negligent supervision, assault, false

imprisonment, and intentional infliction of emotional distress.[1]  Before the Court is Defendants'

Motion For Partial Summary Judgment, seeking summary judgment on Plaintiff's claims that

Defendants violated her right to Equal Protection, that Defendants retaliated against her, and that

Miller engaged in intentional infliction of emotional distress.  (Defs.' Mot. For Partial Summ. J.

(Dkt. No. 27).)  For the following reasons, Defendants' Motion is granted in part and denied in

part.

## I.  Background

### A.  The Facts

Plaintiff was employed by the City to work in the Youth Bureau from March 29, 2010

until March 28, 2011.  (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 1 (Dkt. No. 28); Aff. of

DaMia Harris-Madden ("Harris Aff.") ¶¶ 2, 17 (Dkt. No. 32).)[2]  During Plaintiff's employment,

Harris was employed by the City as the Executive Director of the City's Youth Bureau, (Defs.'

56.1 ¶ 2; Aff. of Jessica C. Moller ("Moller Aff.") Ex. G ("Harris Tr.") 8–9 (Dkt. No. 33); Harris

Aff. ¶ 1), and Jennifer Coker-Wiggins was employed by the City in the positions of Deputy

Commissioner of Human Resources and Commissioner of Human Resources, (Defs.' 56.1 ¶ 3;

Moller Aff. Ex. H ("Coker-Wiggins Tr.") 9, 31).  Coker-Wiggins was the City's first Deputy

Commissioner and Commissioner of Human Resources and had no prior experience running a

---

[1] The Clerk of the Court is respectfully requested to amend the caption, changing "DeMia Harris" to "DaMia Harris."

[2] Plaintiff admits numerous facts stated in Defs.' Rule 56.1 Statement.  (*See* Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 47).)  Accordingly, for ease of reference, the Court cites to Defendants' 56.1 Statement and notes when the relevant facts are in dispute.

human resources department.  (Pl.'s Rule 56.1 Statement ("Pl's 56.1") ¶¶ 3, 56–57 (Dkt. No. 47);
Coker-Wiggins Tr. 10–15, 29–32.)

Harris first hired Plaintiff as a Community Worker Aide.  (Defs.' 56.1 ¶ 5; Harris Tr. 25;
Harris Aff. ¶ 2; Moller Aff. Ex. E ("Cowan Tr.") 27–28.)  For the first few weeks that Plaintiff
worked as a Community Worker Aide, her job consisted of performing various clerical-type
duties, such as typing, as an administrative assistant for Harris.  (Defs.' 56.1 ¶ 6; Harris Tr. 25;
Harris Aff. ¶ 2; Cowan Tr. 28–30.)  Because Plaintiff demonstrated an interest in working with
the students served by the Youth Bureau, Harris assigned Plaintiff to work with the "Students
Taking Responsibility, Ownership Now in Graduating" Program, known as "S.T.R.O.N.G."
("STRONG") in the Spring of 2010.  (Defs.' 56.1 ¶ 7; Harris Tr. 26; Harris Aff. ¶ 3; Cowan Tr.
30–32.)  STRONG, which is is operated by the Youth Bureau in the Mount Vernon High School,
works with high school students to improve their academic performance and character
development, and provides them with career exposure and cultural enrichment opportunities.
(Defs.' 56.1 ¶¶ 8–9; Moller Aff. Ex. F ("Miller Tr.") 32; Harris Aff. ¶¶ 4–5; Cowan Tr. 34.)
Plaintiff remained a Youth Bureau employee during the time that she worked for STRONG.
(Defs.' 56.1 ¶ 12; Harris Tr. 27.)

Miller was employed by the City as the Director of STRONG and served as Plaintiff's
direct supervisor throughout the time that Plaintiff worked for the Youth Bureau.  (Defs.' 56.1
¶¶ 10–11; Miller Tr. 28, 32, 63, 163; Aff. of Hamp Miller, Jr. ("Miller Aff.") ¶ 1 (Dkt. No. 31);
Harris Tr. 32, 180–81; Harris Aff. ¶ 4; Cowan Tr. 95–96.)  When Plaintiff first started working
with STRONG she retained the title Community Worker Aide.  (Defs.' 56.1 ¶ 13; Harris Tr. 64–

3

66.)  Harris, with input from Miller about Plaintiff's work performance, and general input from Coker-Wiggins about Plaintiff's need for full-time employment, decided to appoint Plaintiff to a Project Coordinator position.  (Defs.' 56.1 ¶¶ 13, 15; Harris Tr. 68–75, 231.)  According to Defendants, effective September 20, 2010, Plaintiff was given a temporary appointment to a full-time Project Coordinator position that expired on March 31, 2011, which meant that after that date Plaintiff would not have been compensated.  (Defs.' 56.1 ¶¶ 17–18; Harris Tr. 83–84, 87–88, 150; Harris Aff. ¶ 7; Coker-Wiggins Tr. 68.)  Plaintiff disputes this fact, stating that she was "given an appointment for a 'six month probationary term[,]' . . . within the purview of the [City] Civil Service Law," under which " a probationary employee can be terminated at the end of [her] term but [her] term will not simply 'expire.'"  ("Pl.'s 56.1" ¶¶ 17–18 (citations omitted).)  At the time Plaintiff was appointed to the Project Coordinator position, Harris was not aware of any major problems with Plaintiff's performance.  (Defs.' 56.1 ¶ 19; Harris Tr. 75; Harris Aff. ¶ 9.)  Plaintiff agrees, but also states that Harris was aware at the time that she hired Plaintiff as Project Coordinator, that Plaintiff did not meet the educational or experience requirements of the position.  (Pl.'s 56.1 ¶ 19.)

As a Project Coordinator, Plaintiff worked solely with STRONG and was "responsible for managing all the day-to-day functions of a program site, [and] to a certain degree[,] personnel, planning, screening, student recruitment, press releases, field trip organization, and in some instances, answering phones, interacting with parents, [and] interacting with school staff." (Defs.' 56.1 ¶ 20; Miller Tr. 171; Harris Aff. ¶ 8.)  Some of the job duties performed by Plaintiff as a Project Coordinator were similar to the job duties that she had performed as a Community

Aide, but Plaintiff's job duties expanded as a Project Coordinator.  (Defs.' 56.1 ¶ 21; Harris Tr. 65–67; Miller Tr. 19–20.)  Plaintiff was advised what her job duties as a Project Coordinator were and what was expected of her in that position.  (Defs.' 56.1 ¶ 22; Miller Tr. 140–41.) Harris was "extremely demanding with regard to the . . . STRONG Program" and held people accountable for their performance.  (Defs.' 56.1 ¶ 23; Miller Tr. 98–99.)

  Throughout the time that Plaintiff worked for the Youth Bureau, the City had an established written anti-harassment policy that prohibited sexual harassment (the "Policy"). (Defs.' 56.1 ¶ 43; Coker-Wiggins Tr. 27, 34; Aff. of Judy Williams ("Williams Aff.") ¶ 2 Ex. A (Dkt. No. 30).)  The Policy provided a description of (i) what constituted prohibited sexual harassment, (ii) set forth a complaint procedure for employees to report instances of harassment, which provided that such reports could be made verbally or in writing and that all complaints of harassment would be investigated promptly, and (iii) prohibited retaliation against any employee who made a good faith complaint of harassment under such policy.  (Defs.' 56.1 ¶¶ 44–47; Williams Aff. Ex. A.)  The Policy was distributed to all City employees, including Plaintiff. (Defs.' 56.1 ¶¶ 48, 51; Coker-Wiggins Tr. 40–41; Cowan Tr. 288.)  Coker-Wiggins conducted numerous training sessions on the Policy for City employees, during which she reviewed the complaint procedure set forth in that policy, and the City brought in an outside professor from a local college to conduct sexual harassment training sessions for its employees.  (Defs.' 56.1 ¶¶ 49–50; Coker-Wiggins Tr. 35, 39–42; Miller Tr. 187–91, 195.)  Plaintiff attended several of these training sessions.  (Pl.'s 56.1 ¶ 60.)  Plaintiff alleges that during these sessions, City employees were informed that in the absence of written, audio recorded and/or video recorded

evidence, employees would have insufficient evidence to proceed with a sexual harassment complaint and were also severely admonished about the adverse employment consequences associated with making false claims of sexual harassment.  (Pl.'s 56.1 ¶¶ 49, 61.)[3]

Plaintiff alleges that Miller sexually harassed Plaintiff, culminating in a vicious assault that occurred in or around January 2011.  (Pl.'s 56.1 ¶ 67.)  For the purpose of the instant Motion, Defendants do not contest the allegations of sexual harassment that Plaintiff makes in her Amended Complaint, and, accordingly, the Court accepts them as true.  From April 2010 until September 2010, Plaintiff and Miller shared an office in the Mount Vernon High School and were the only two individuals in that office.  (Am. Compl. ¶ 24.)  Throughout Plaintiff's employment, Miller engaged in a continuous and constant course of sexual harassment, discrimination, and intimidation, and created a hostile workplace.  (*Id.* ¶ 25.)  Specifically, on a daily basis, Miller made comments about Plaintiff's body, her appearance, and his desire to have sexual relations with her.  (*Id.* ¶ 26.)  Miller also physically touched Plaintiff in a sexual manner, including feeling her back, pinching her buttocks, slapping and/or squeezing her buttocks, and grabbing her chest.  (*Id.* ¶ 27.)  From April 2010 to September 2010, Miller exposed his penis to Plaintiff at least 20 times.  (*Id.* ¶ 28.)  Miller also made comments to Plaintiff that he would leave his wife if he could and that Plaintiff "shouldn't be single" because she had "children to support."  (*Id.*)

To intimidate Plaintiff and make her feel powerless to stop his harassment, Miller would constantly state to Plaintiff that he "had a special relationship" with Harris and that Plaintiff

---

[3] Plaintiff only cites to her Notice of Claim to support this statement.  (Pl.'s 56.1 ¶¶ 49,

would be well advised not to report any of his conduct to Harris.  (*Id.* ¶¶ 29, 34.)  When Plaintiff complained to her co-worker, Elizabeth Abel ("Abel"), about the sexual harassment, Miller commented to Plaintiff that she should not make any reports to Abel if she wanted to keep her job.  (*Id.* ¶ 33.)  In or around August 2010, Miller invited Plaintiff to accompany him on a trip to Philadelphia and told her that if she did not go with him that she might not have a job because she was not "showing him that she wanted to work there."  (*Id.* ¶¶ 30, 32.)  In or around September 2010, another employee began to work in the office that Plaintiff and Miller shared. (*Id.* ¶ 37.)  During this time, Miller would call Plaintiff to the side of the office, where he continued to expose himself to Plaintiff and to make sexually explicit comments to her.  (*Id.* ¶ 38.)  Miller told Plaintiff that it was "too bad" that the other employee was in the office because he "missed [their] time together."  (*Id.* ¶ 39.)  Miller would continually tell Plaintiff that she was an at-will employee who could be fired at any time, and told her that he was not sure she was "working out" in her position.  (*Id.* ¶ 41.)  From September 2010 to December 2010, Miller began showing up at Plaintiff's other job as a fitness instructor at the YMCA in Yonkers, where he would stare at her and approach her after class.  (*Id.* ¶¶ 46–49.)  Miller also came to Plaintiff's residence and forced his way inside, ostensibly to retrieve a camera that Plaintiff used to take pictures to promote STRONG.  (*Id.* ¶ 50.)

In January 2011, Miller locked Plaintiff in his office and exposed his penis to her.  (*Id.* ¶ 51.)  As Plaintiff attempted to leave, Miller pushed her away from the door and blocked her, telling Plaintiff that she had to give him some "relief" and saying, "if I don't get relief, you will

61.)

lose your job." (*Id.* ¶¶ 52–53.)  Miller told Plaintiff that it was "time to get to the bottom of this, I'm tired of this, you need to relieve me."  (*Id.* ¶ 54.)  Plaintiff pushed her way out of the office. (*Id.*).  Miller's harassment continued through March 2011.  (*Id.* ¶ 61.)  On March 21, 2011, Miller told Plaintiff that he was "tired of her nonsense" and that "either you do me or you're done."  (*Id.*)  On March 24, 2011, Miller slapped Plaintiff on the buttocks and rubbed "his crotch area" against her.  (*Id.*)

Plaintiff did not make any formal complaints of sexual harassment against Miller before March 21, 2011.  (Defs.' 56.1 ¶ 52; Cowan Tr. 216–17.)  Nevertheless, according to Plaintiff, she continually reported Miller's conduct to Coker-Wiggins and attempted to make a formal complaint concerning Miller's sexual harassment on numerous occasions, but was discouraged from doing so by Coker-Wiggins.  (Pl.'s 56.1 ¶¶ 52, 68; Cowan Tr. 124, 132, 178, 201–02, 234–37, 265–72.)  Specifically, Coker-Wiggins told Plaintiff that she should "keep her head down" and warned Plaintiff of the adverse impact to her career if she were to report the sexual harassment.  (Pl.'s 56.1 ¶ 69; Cowan Tr. 132, 177–78, 201–02, 234–37, 265–72.)  At her deposition, Plaintiff testified that she discussed filing a formal complaint with Coker-Wiggins on March 24, 2011.  (Cowan Tr. 266; *see also* Pl.'s 56.1 ¶ 70.)  When Plaintiff presented her written complaint, Coker-Wiggins told her that she "did not have enough" to sustain a sexual harassment complaint and that she should produce another complaint that did not contain the sexual harassment content.  (Pl.'s 56.1 ¶ 71; Cowan Tr. 265–272.)  On March 25, 2011, Plaintiff sent Coker-Wiggins an email, which stated that it was Plaintiff's "initial complaint of hostility in the workplace against Hamp Miller."  (Defs.' 56.1 ¶ 53; Cowan Tr. 285–86; *Id.* at Ex. 4;

Coker-Wiggins Tr. 117; *Id.* at Ex. 3.)  Defendants claim that Plaintiff did not file a written sexual

harassment complaint against Miller with the City, (Defs.' 56.1 ¶ 54; Cown Tr. 300–03), but

Plaintiff denies this fact, (Pl.'s 56.1 ¶ 54; Cowan Tr. 304–05).

 Plaintiff did not complain to Harris that she was being sexually harassed by Miller.

(Defs.' 56.1 ¶ 40; Harris Tr. 208–10; Harris Aff. ¶ 20.)  However, during her employment as a

Project Coordinator, Plaintiff made numerous complaints about the computer that she was

assigned to use for STRONG, including that it did not work or was not working properly, that it

could not access the Internet, and that it did not have the appropriate software.  (Defs.' 56.1 ¶ 39;

Cowan Tr. 61–62, 143–44, 147, 179; Miller Tr. 84–85; Harris Tr. 208–09, 251.)  Defendants

contend that the first time Harris became aware that Plaintiff claimed that Miller sexually

harassed her was after Plaintiff served her Notice of Claim on the City.  (Defs.' 56.1 ¶ 41; Harris

Tr. 210–13; Harris Aff. ¶ 22.)  Plaintiff contests this fact.  (Pl's 56.1 ¶ 41.)  Plaintiff's Notice of

Claim is dated June 27, 2011 and was served on the City on or about June 28, 2011.  (Defs.' 56.1

¶ 42; Harris Aff. ¶ 22; Moller Aff. Ex. D; Miller Tr. 89.)

 Plaintiff's employment was terminated on March 28, 2011.  (Defs.' 56.1 ¶ 24; Harris Aff.

¶ 17; Miller Tr. 91.)  Harris made the final decision to terminate Plaintiff's employment.  (Defs.'

56.1 ¶ 25; Harris Aff. ¶¶ 18–19.)  According to Plaintiff, she was never informed by Harris that

she was terminated, and only learned of the termination from Coker-Wiggins who advised her

after she submitted her formal complaint against Miller that "it would be better for everyone if

[you] didn't come back."  (Pl.'s 56.1 ¶ 25; Cowan Tr. 272.)  Harris had the authority to hire and

fire employees at the Youth Bureau, including those employees that worked for the STRONG

Program.  (Defs.' 56.1 ¶ 26; Harris Aff. ¶¶ 18–19; Miller Aff. ¶ 4; Coker-Wiggins Tr. 93, 170.)

In contrast, Miller did not have the authority to terminate Plaintiff's employment with the Youth

Bureau or STRONG.  (Defs.' 56.1 ¶ 27; Harris Aff. ¶¶ 18–19; Miller Aff. ¶¶ 4–6.)  According to

Defendants, Harris decided to terminate Plaintiff's employment because of deficiencies in her

performance that culminated in an incident in late March of 2011 involving Plaintiff's keys to

STRONG's office.  (Defs.' 56.1 ¶ 28; Harris Tr. 151, 173; Harris Aff. ¶¶ 9–17.)  Plaintiff

disputes this fact.  (Pl.'s 56.1 ¶ 28.)

　　　　STRONG is a grant-funded program and the grant that funds STRONG requires it to

recruit and provide services to a total of 300 high school students every year.  (Defs.' 56.1 ¶¶ 29–

30; Harris Tr. 27, 58; Miller Tr. 11.)  To meet this requirement, STRONG staff was responsible

for directly providing services to 150 students in the eleventh and twelfth grades, and a

subcontractor of STRONG, The Guidance Center, was responsible for providing services to 150

students in the ninth and tenth grades.  (Defs.' 56.1 ¶ 31; Harris Tr. 92–93, 96; Miller Tr. 40–42.)

According to the terms of the grant, each student needed to complete at least one hour of

STRONG programming per day for 30 days during the academic year.  (Defs.' 56.1 ¶ 32; Harris

Tr. 123; Miller Tr. 15–18.)  STRONG's year of programming starts in July and ends the

following June.  (Defs.' 56.1 ¶ 33; Miller Tr. 36.)  Plaintiff contests these facts because although

she requested production of the grant terms and documentation, the material was never provided

in discovery.  (Pl.'s 56.1 ¶¶ 30–33.)

　　　　Whether STRONG was meeting its required recruitment numbers was a "major concern"

for Harris.  (Defs.' 56.1 ¶ 34; Harris Tr. 75, 98.)  On or about November 29, 2010, Harris

informed Plaintiff that she was "gravely concerned" about Plaintiff's recruitment of students to STRONG. (Defs.' 56.1 ¶ 35; Harris Aff. ¶ 10.)  Only 66 students had been recruited to STRONG by the end of February 2011 and STRONG did not meet its required recruitment numbers for the 2010-2011 school year.  (Defs.' 56.1 ¶¶ 36–37; Harris Tr. 205; Harris Aff. ¶ 11.) Again, Plaintiff contests this fact on the basis that she did not receive the material she asked for in discovery.  (Pl.'s 56.1 ¶¶ 36–37.)  Plaintiff claims that she was never disciplined for poor job performance and that Harris never wrote anything derogatory about Plaintiff's performance in her monthly reports about STRONG.  (Pl.'s 56.1 ¶¶ 73–74; Aff. of Benjamin L. Felcher Leavitt ("Leavitt Aff.") Ex. 1 (Dkt. No. 42).)  Plaintiff inexplicably states that the reports were "created by Ms. DaMia Harris detailing the progress of the . . . STRONG program."  (Leavitt Aff. ¶ 2.) The reports make clear, however, that they are from Miller to Harris.  (*See e.g.*, Leavitt Aff. Ex. 1, at 1059.)  Harris also states that she "did not author the monthly reports or otherwise take part in their creation or preparation."  (Reply Aff. of DaMia Harris-Madden ("Harris Reply") ¶ 3 (Dkt. No. 51).)

### B.  Procedural History

Plaintiff filed the initial Complaint on September 11, 2012.  (Dkt. No. 1.)  Plaintiff filed the Amended Complaint on August 16, 2013.  (Dkt. No. 17.)  The Amended Complaint alleges several claims based on Miller's sexual harassment of Plaintiff.  Specifically, Count One alleges violations of Plaintiff's right to Equal Protection under the Fourteenth Amendment ("Count One"); Count Two alleges that Defendants conspired to deprive Plaintiff of Equal Protection under the Fourteenth Amendment ("Count Two"); Count Three alleges that Defendants engaged

11

in sexual harassment of Plaintiff ("Count Three"); Count Four alleges that Defendants retaliated against Plaintiff for reporting Miller's conduct by terminating her employment ("Count Four"); Count Five alleges negligent supervision ("Count Five"); Counts Six and Eight allege assault against Miller ("Count Six" and "Count Eight"); Count Seven alleges false imprisonment against Miller ("Count Seven"); Count Nine alleges intrusion upon seclusion against Miller ("Count Nine"); and Count Ten alleges that Defendants intentionally inflicted emotional distress on Plaintiff ("Count Ten"). The Court so ordered a stipulation on February 4, 2014, dismissing with prejudice Count Nine and Plaintiff's claims for sexual harassment and retaliation alleged in Count Three and Count Four against Harris and Miller. (Dkt. No. 23.)

Pursuant to a Scheduling Order dated January 21, 2014, (Dkt. No. 21), Defendants filed their Motion For Partial Summary Judgment and accompanying papers on March 10, 2014, (Dkt. Nos. 27–33). Plaintiff filed her Memorandum of Law in Opposition to the Motion and accompanying papers on May 30, 2014. (Dkt. Nos. 42–43, 45–47.) Defendants filed their Reply Memorandum of Law and accompanying papers on June 20, 2014. (Dkt. Nos. 50–52.)

## II. Discussion

### A. Standard of Review

Summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co*., *v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.,* No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party

13

opposing summary judgment may not merely rest on the allegations or denials of his

pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental

Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At

summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess

whether there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No.

1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's

goal should be "'to isolate and dispose of factually unsupported claims.'" *Geneva Pharm. Tech.

Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685,

2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

B.  Plaintiff's Claim Under 42 U.S.C. § 1983

1.  *Monell* Claim Against the City

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under

color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of

Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  "Congress did not intend municipalities to be held

liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a

constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978).

Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public

14

official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a

constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the

municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d

Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y.

Sept. 1, 2010) (recommending dismissal of a claim against agencies where plaintiff did not

allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398

(S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester Cnty.*, No. 09-CV-3727, 2010 WL 3397375, at *9

(S.D.N.Y. Apr. 16, 2010) (recommending dismissal of a claim against county because complaint

"does not allege the existence of an unconstitutional custom or policy"), *adopted as modified sub*

*nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010).

The fifth element reflects the notion that "a municipality may not be held liable under § 1983

solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403

(1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As

subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held

liable when the municipality itself deprives an individual of a constitutional right.").  In other

words, a municipality may not be liable under Section 1983 "by application of the doctrine of

*respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also*

*Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity

may only be held liable where the entity *itself* commits a wrong" (emphasis in original)).

Instead, there must be a "direct causal link between a municipal policy or custom and the alleged

constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of*

15

*St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible

when, and only when, their official policies cause their employees to violate another person's

constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into

whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327,

336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003).  A plaintiff may satisfy the "policy

or custom" requirement by alleging one of the following.  He or she may allege the existence of

"(1) a formal policy officially endorsed by the municipality; (2) actions taken by government

officials responsible for establishing the municipal policies that caused the particular deprivation

in question; (3) a practice so consistent and widespread that, although not expressly authorized,

constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4)

a failure by policymakers to provide adequate training or supervision to subordinates to such an

extent that it amounts to deliberate indifference to the rights of those who come into contact with

the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77

(S.D.N.Y. 2010) (citations omitted).  Generally, "a custom or policy cannot be shown by

pointing to a single instance of unconstitutional conduct by a mere employee of the

[municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. v. Tuttle*, 471 U.S. 808,

823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not

sufficient to impose liability under *Monell*, unless proof of the incident includes proof it was

caused by an existing, unconstitutional municipal policy, which policy can be attributed to a

municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y.

16

2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").  In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404); *see also Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a *constitutional* violation.  There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

Plaintiff bases her *Monell* claim on two contentions.  First, Plaintiff claims that "the City engaged in a woeful failure to train its employees in such a way as to constitute deliberate indifference to the constitutional rights of municipal employees."  (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. For Partial Summ. J. ("Pl.'s Mem.") 6 (Dkt. No. 43).)  "To establish deliberate indifference[,] a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or

sanction violations of constitutional rights." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012). "[D]eliberate indifference is a stringent standard of fault, and necessarily depends on a careful assessment of the facts at issue in a particular case." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (citations and internal quotation marks omitted). "The operative inquiry," in turn, "is whether those facts demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." *Id.* (internal quotation marks omitted); *see also Jones*, 691 F.3d at 81 ("[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent."). Accordingly, a jury may infer deliberate indifference "where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash*, 654 F.3d at 334 (citations, alterations, and internal quotation marks omitted).

The Second Circuit has identified three requirements to determine whether a "failure to train or supervise constitutes deliberate indifference." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007). The plaintiff must show "[(1)] that [the] policymaker knows to a moral certainty that her employees will confront a given situation . . .[,] [(2)] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation . . . [,] [and] [(3)] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (citations and internal quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate

18

deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (internal quotation marks omitted). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* (internal quotation marks omitted); *see also City of Canton*, 489 U.S. at 389 (explaining that a city may be liable under Section 1983 "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality"). Moreover, "at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that the deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Jenkins*, 478 F.3d at 94 (internal quotation marks omitted).

Here, it is undisputed that Defendants had a training program for sexual harassment in the workplace. (Defs.' 56.1 ¶¶ 49–50; Coker-Wiggins Tr. 35, 39–40; Miller Tr. 187–91, 195.) Accordingly, Plaintiff must "identify a specific deficiency in the [C]ity's training program and establish that the deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 391). To meet this burden, Plaintiff has alleged two deficiencies in the training program, specifically, Coker-Wiggins's statements that a complainant needs to have recorded evidence to bring a claim of sexual harassment, and that employees were severely admonished about the adverse employment consequences associated with making false claims of sexual harassment. (Pl.'s 56.1 ¶¶ 49, 61.) Plaintiff does not,

19

however, point to anything in the record, other than her Notice of Claim, to support these allegations.  In the instant Motion For Partial Summary Judgment, Plaintiff "cannot rely on the mere allegations . . . contained in the pleadings" to create an issue of material fact.  *Walker*, 2014 WL 1244778, at *5.

Even assuming that Plaintiff has offered evidence to support her claims about the training sessions that Coker-Wiggins conducted, Plaintiff has not established that the deficiencies in the training program were closely related to the ultimate injury to satisfy her burden of production on a failure to train claim.  To the extent that Plaintiff bases this claim on Coker-Wiggins's failure to advise Plaintiff of her constitutional rights by stating that employees needed recorded evidence, this argument fails.  (Pl.'s Mem. 8.)  The focus of a failure to train claim is on whether policymakers continued to adhere to an approach that they knew or should have known "has failed to prevent *tortious conduct by employees*," *Connick*, 131 S. Ct. at 1360 (emphasis added), not on whether their failure to train provided incorrect information to employees about their rights.  *See Stevens*, 607 F. Supp. 2d at 359 (explaining that "in a failure to train claim, a court must examine deficiencies in the training provided to the employees alleged to have violated the plaintiffs' constitutional rights, not deficiencies in any training provided to the plaintiffs").

Next, to the extent that Plaintiff suggests that Coker-Wiggins's failure to properly train employees resulted in Miller's conduct, this claim also fails.  Plaintiff points to no evidence that suggests that Miller's conduct was driven or even affected by Coker-Wiggins's statements that victims of sexual harassment needed to present evidence before making a claim.  *See Stevens*, 607 F. Supp. 2d at 358–59 (rejecting the plaintiffs' theory that the defendant failed to train an

employee who engaged in sexual harassment because plaintiffs did not "offer[] evidence or argument as to how the deficiencies in the training may have contributed to [the harasser's] conduct, or how better or different training could have prevented [the harasser's] conduct"); *Perez v. N.Y.C. Dep't of Corr.*, No. 10-CV-2697, 2013 WL 500448, at *3 (E.D.N.Y. Jan. 17, 2003) (finding it relevant that the "plaintiff has not provided any evidence that a lack of adequate training was the actual cause of his constitutional injury" (internal quotation marks omitted)). Indeed, Coker-Wiggins testified that during the training sessions, she reviewed the harassment policy with employees "to make sure that the employees understood the policies of the [C]ity," and that the sessions included two videos and a pamphlet describing sexual harassment, accompanied with a quiz to ensure that employees understood what they viewed in the videos. (Coker-Wiggins Tr. 40–41.)  Accordingly, Plaintiff does not point to deficiencies in the training program that were closely related to Miller's conduct.

Assuming, arguendo, that the alleged deficiencies in Coker-Wiggins's training sessions were related to Plaintiff's ultimate injury, Plaintiff has failed to present evidence that policymakers were aware of these deficiencies.  *See Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1163 (E.D.N.Y. 2003) ("There is no evidence that [the defendant town] knew of [the harasser's] harrasment of [the plaintiff], nor that it knew 'to a moral certainty' that sexual harassment was prevalent among its employees, such that its failure to take action can be characterized as deliberate indifference.").  The "stringent 'deliberate indifference' standard requires proof that the governmental policymakers were on 'actual or constructive notice that a particular omission in their training program caused city employees to violate citizens'

constitutional rights,' and that the policymakers nonetheless chose to retain that training program." *Miller v. County of Nassau*, No. 10-CV-3358, 2013 WL 1172833, at *8 (E.D.N.Y. Mar 19, 2013) (quoting *Connick*, 131 S. Ct. at 1360). In other words, accepting Plaintiff's representations of Coker-Wiggins's statements during the training sessions as true, there is no evidence that policymakers for the City were aware that Coker-Wiggins allegedly informed employees that they needed recorded evidence of sexual harassment or admonished them of the consequences for falsely reporting a sexual harassment claim. Plaintiff, therefore, has not demonstrated a failure to train that amounts to deliberate indifference under *Monell*.

Second, Plaintiff claims that "she was terminated for reporting sexual harassment because of the City's policy that required employees who complained of sexual harassment to possess documentary proof before they would be permitted to proceed with formal complaints." (Pl.'s Mem. 5–6.) Specifically, Plaintiff argues that the City's "sexual harassment policy, established in the City Charter[,] was augmented and implemented in trainings designed and put on by . . . Coker-Wiggins[,] [who] possessed policy making authority with regard to Human Resource procedures and, through her exercise of this authority, created a policy that directly caused Plaintiff's harassment." (*Id.* at 6.) The Court interprets this contention as advancing two theories: that "[(1)] actions taken by government officials responsible for establishing the municipal policies . . . caused the particular deprivation in question; [and that] [(2)] [there was] a practice so consistent and widespread that, although not expressly authorized, constitute[d] a custom or usage of which a supervising policy-maker must have been aware." *Brandon*, 705 F. Supp. 2d at 276–77. The Court addresses each of these theories in turn.

22

"Where a plaintiff seeks to hold a municipality liable for a single decision by a municipal policymaker, [the plaintiff] must show that the official had final policymaking power." *City of Waterbury*, 542 F.3d at 37 (citation, alterations, and internal quotation marks omitted). "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id.*; *see also Eldridge v. Rochester City Sch. Dist.*, 968 F. Supp. 2d 546, 562 (W.D.N.Y. 2013) ("An official may be a final policymaker as to some issues but not as to others."). "[T]he question of whether a given official is the . . . final policymaking official in a given area is a matter of law to be decided by the court" "*before* the case is submitted to the jury." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (internal quotation marks omitted); *see also City of Waterbury*, 542 F.3d at 37 ("Whether an official has final policymaking authority is a legal question, determined on the basis of state law."). Moreover, "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes*, 208 F.3d 49 at 57–58.

Plaintiff argues that Coker-Wiggins "was the [C]ity official in charge of creating the City's sexual harassment training and, accordingly, [its] policy with regard to how claims of sexual harassment would be handled." (Pl.'s Mem. at 7.) Plaintiff offers no evidence, however, that Coker-Wiggins was a "final policymaker" as a matter of law to justify liability under *Monell*. Indeed, the City's sexual harassment policy is embedded within the City Code. (Coker-Wiggins Tr. 27, 32–37.) Plaintiff points to no state or City law that vests Coker-Wiggins

with final policymaking authority.  Rather, the City Code provides the harassment and retaliation

policy that "applies to all City employees."  (*See* Williams Aff. Ex. A (Mount Vernon City Code

(the "Code") Ch. 50, Art. VI §§ 50-58–50-60).)  The Code states that "[t]o assure compliance

with [the] policy, Commissioners, Deputy Commissioners and/or any other supervisory or

managerial personnel must take timely and appropriate corrective action when instances of

harassment come to their attention."  (Code Ch. 50, Art. VI § 50-58.)  The Code outlines the

procedures that a complainant and the Commissioner and Deputy Commissioner, among others,

must follow.  (*Id.* § 50-60.)  Furthermore, the Code contains no provision suggesting that the

City may delegate its policymaking authority to the Commissioner or Deputy Commissioner to

change the policy.  *Cf. Port Wash. Teachers' Ass'n v. Bd. of Educ. of Port Wash. Union Free

Sch. Dist.*, 478 F.3d 494, 501 (2d Cir. 2007) (explaining that under New York Law, the Board of

Education could delegate its policymaking authority (citing N.Y. Educ. Law ¶ 1709(33)).  Even

if it did, Plaintiff points to no evidence that the City delegated its policymaking authority to

Coker-Wiggins.  Rather, Coker-Wiggins testified that although she was involved "[t]o some

extent" in instituting a "minor change" in the reporting procedures for sexual harassment, she

had no authority to unilaterally amend the City's sexual harassment policy.  (Coker-Wiggins Tr.

32–36 (testifying that "[i]f [you are] going to change the charter, amend it, change it majorly,

there is more to it that [she] [does not] necessarily know about.  [She] just know[s] there is more

to it.").)  Plaintiff claims that Coker-Wiggins had policymaking authority because she

"augmented and implemented" the City's policy through the training that she provided to City

employees.  However, "[l]iability for unauthorized acts is personal; to hold the municipality

liable, *Monell* tells us, the agents' actions must implement rather than frustrate the government's policy." *City of Waterbury*, 542 F.3d 31, 36–37 (internal quotation marks omitted); *see also Brenes v. City of New York*, 733 F. Supp. 2d 357, 363 (E.D.N.Y. 2010) (same).  In short, Plaintiff points to nothing to suggest that Coker-Wiggins in her capacity as Deputy Commissioner of Human Resources and Commissioner of Human Resources possessed final policymaking authority as a matter of law such that her conduct would support liability under *Monell*.  *See Saunders v. N.Y.C. Dep't of Educ.*, No. 07-CV-2725, 2010 WL 2985031, at *3 (E.D.N.Y. July 20, 2010) (holding that a deputy director for human resources "was not a high-ranking official with final authority over significant matters sufficient to sustain a *Monell* claim against the [New York City Department of Education]") (citation and internal quotation marks omitted).

However, under the third theory of *Monell* liability, Plaintiff has established a claim based on Coker-Wiggins's failure to address her complaints.  The Second Circuit has held that "a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (citing *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir. 1980)).  Moreover, "municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct."  *Batista*, 702 F.2d at 397. Specifically, "[i]n the context of sexual harassment, inaction may be actionable, and failure to promptly and properly respond to complaints may expose a supervisor or employer to liability under anti-discrimination laws."  *Burhans v. Lopez*, 24 F. Supp. 3d 375, 382 (S.D.N.Y. 2014) (citing *Duch v. Jakubek*, 588 F.3d 757, 766 (2d Cir. 2009); *Ferris v. Delta Air Lines, Inc.*, 277

25

F.3d 128, 136 (2d Cir. 2001)).  Put another way, the "'failure properly to investigate and address allegations' of harassment [may] allow[] for the conduct to become an accepted custom or practice of the employer."  *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) (alterations omitted) (quoting *Gierlinger v. New York State Police*, 15 F.3d 32, 34 (2d Cir. 1994)); *see also Stevens*, 607 F. Supp. 2d at 353 (same).  Here, Plaintiff has testified that she made several complaints about Miller's pervasive sexual harassment to co-workers and to Coker-Wiggins over the course of several months.  Coker-Wiggins did not investigate her claims, but rather informed Plaintiff that she should not complain of the harassment.  (Pl.'s 56.1 ¶¶ 52, 68; Cowan Tr. 124, 132, 178, 201–02, 234–37.)  Indeed, Plaintiff testified that Coker-Wiggins requested that she re-write her formal complaint in March 2011 to omit the allegations of sexual harassment.  (Cowan Tr. 265–72.)  This testimony creates an issue of fact as to whether, because of Coker-Wiggins's failure to investigate Plaintiff's complaints, the unconstitutional conduct—specifically, Miller's pervasive sexual harassment and intimidation— became an accepted custom of the City.  *See Matusick*, 757 F.3d at 63 (noting that a supervisor's "high-level position . . . and her failure to address the harassment support[ed] an inference that [the defendant] also knew of the harassment and allowed for the conduct to become the accepted custom or practice of the [workplace]"); *cf. Peguero-Miles v. City Univ. of N.Y.*, No. 13-CV-1636, 2014 WL 4804464, at *10 (S.D.N.Y. Sept. 25, 2014) ("Assuming, as the [c]ourt must on a motion to dismiss, that, as alleged, [the] [p]laintiff's employer disregarded complaints of discrimination, discouraged employees from complaining about discrimination, and fired other individuals who similarly complained of discrimination, [the] [p]laintiff does not merely assert

that a policy or custom exists but instead alleges facts from which, at least circumstantially, such a policy can be inferred.").  Accordingly, the Court denies Defendants' Motion For Summary Judgment as to Plaintiff's claim against the City under § 1983.

### 2.  Section 1983 Claim Against Individual Defendants

Plaintiff also presses claims under 42 U.S.C. § 1983 against Miller and Harris for violating her "right to equal protection by subjecting her to a hostile work environment and sexual harassment."  (Am. Compl. ¶¶ 70–73.)  "[T]he Equal Protection Clause protects . . . employees from sex-based workplace discrimination, including hostile work environments and disparate treatment."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).  Similarly, "[s]exual harassment that rises to the level of gender discrimination is actionable under § 1983 as violative of the Fourteenth Amendment to equal protection."  *Pedrosa v. City of New York*, No. 13-CV-1890, 2014 WL 99997, at *5 (S.D.N.Y. Jan. 9, 2014) (citing *Annis v. County Of Westchester*, 36 F.3d 251, 254 (2d Cir. 1994)).  "[H]arassment that transcends coarse, hostile[,] and boorish behavior can rise to the level of a constitutional tort."  *Annis*, 36 F.3d at 254; *see also Wilkinson v. N.Y. State Olympic Reg'l Dev. Auth.*, 822 F. Supp. 2d 182, 191 (N.D.N.Y. 2011) (same).

Contrary to Defendants' suggestion otherwise, a "Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action, such as a claim for denial of equal protection, so long as the § 1983 claim is based on a distinct violation of a constitutional right."  *Humphrey v. County of Nassau*, No. 06-CV-3682, 2009 WL 875534, at *17 (E.D.N.Y. Mar. 30, 2009) (internal quotation marks omitted); *see also Alexander v. Westbury Union Free Sch. Dist.*, 829 F.

27

Supp. 2d 89, 119 (E.D.N.Y. 2011) ("A plaintiff may only concurrently assert a Title VII cause of action with a section 1983 cause of action 'if some other law than Title VII is the source of the right alleged to have been denied.'" (quoting *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993)).  Even though "Title VII claims are not cognizable against individuals, individuals may be held liable under . . . [§] 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir. 2004); *see also Humphrey*, 2009 WL 875534, at *17 (same); *cf. Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Employers, not individuals, are liable under Title VII.").  Indeed, as the Second Circuit has noted, it has "long recognized that Title VII-based hostile work environment claims by government employees are actionable under § 1983." *Raspardo*, 770 F.3d at 114.

### a.  Section 1983 Claim Against Miller

To establish a claim under § 1983 against an individual defendant, the plaintiff must demonstrate the defendant's personal involvement in the alleged discrimination.  *Patterson*, 375 F.3d at 229; *see also Raspardo*, 770 F.3d at 115 ("If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." (emphasis in original)).  Plaintiff has demonstrated that Miller was personally involved in discriminating against her.  Here, Plaintiff alleges that Miller "engaged in a despicable course of conduct involving creating a hostile work place and engaging in sexual harassment and discrimination by making sexual comments to Plaintiff, requesting that she perform sexual acts with him, appearing at her home unannounced, exposing himself to her[,]

28

and finally locking her in a room and attempting to assault her." (Am. Compl. ¶ 18.) Specifically, Plaintiff alleges that "on a daily basis, Miller made comments about [her] body, her appearance[,] and his desire to have sexual relations with her[,]" and "Miller would, also on a daily basis, physically touch Plaintiff in a sexual manner including but not limited to: feeling Plaintiff's back, arms [sic] hair[,] pinching her buttocks[,] slapping and/or squeezing her buttocks and grabbing her chest." (*Id.* ¶¶ 26–27.) Moreover, Plaintiff alleges that "from the time period from April 2010 to September 2010, Miller exposed his penis to Plaintiff no less than 20 times." (*Id.* ¶ 28.) Plaintiff alleges that Miller intimidated her to deter her from reporting his sexual harassment. (*Id.* ¶¶ 33, 41.) Plaintiff also alleges that Miller began showing up at her other job to stare at her, forced his way inside her residence, and in January 2011, locked her in his office and exposed his penis to her. (*Id.* ¶¶ 47–51.) Tellingly, Defendants have not moved for summary judgment on the assault and false imprisonment claims against Miller. To the extent that Defendants seek summary judgment as to the § 1983 claim against Miller, they do so as a matter of law and do not otherwise explain how these allegations, which are not contested on the instant Motion, do not "transcend[] coarse, hostile[,] and boorish behavior." *Annis*, 36 F.3d at 254; *see also Atkinson v. N.Y. State Olympic Reg'l Dev. Auth.*, 822 F. Supp. 2d 182, 191 (N.D.N.Y. 2011) (same). The Court concludes that these troubling allegations are sufficient for a jury to find that Miller's conduct was "independently sufficient to create a hostile work environment" to warrant individual liability under § 1983. *Raspardo*, 770 F.3d at 115; *see also id.* 117–18 (holding that the "four principal incidents of [the defendant's] behavior alleged by [the plaintiff], including unwanted physical contact and comments of a sexual nature in front of

other officers, when combined with the 'over ten occasions' on which [the defendant] allegedly made comments about [the plaintiff's] body during the same one-year period, are sufficient to permit a jury to find a hostile work environment" pursuant to § 1983); *cf. Atkinson*, 822 F. Supp. 2d at 192 (finding that allegations that an employer grabbed the plaintiff, touched her inappropriately, directed sexual gestures towards her, and "continuously made inappropriate remarks to her, including comments about his genitalia," withstood a motion to dismiss the plaintiff's § 1983 claim against the employer).  Accordingly, Defendants' Motion For Summary Judgment as to Plaintiff's § 1983 claim against Miller is denied.

### b.  Section 1983 Claim Against Harris

As to Plaintiff's § 1983 claim against Harris, "[i]ndividual liability under § 1983 in hostile work environment claims may also involve supervisory liability."  *Raspardo*, 770 F.3d at 116.  "'[B]ecause vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (alteration omitted) (quoting *Iqbal*, 556 U.S. at 676)).  To establish that a supervisor was personally involved in the unconstitutional conduct, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that the unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[4]  "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of plaintiff's deprivation," and that the "supervisor's behavior constituted intentional discrimination on the basis of . . . sex."  *Raspardo*, 770 F.3d at 116.

In her Memorandum of Law in Opposition to Defendants' Motion, Plaintiff fails to address her § 1983 claim against Harris.  Indeed, in the portion of her brief addressing these claims, Plaintiff does not mention Harris.  Defendants addressed Plaintiff's § 1983 claim against Harris in their Memorandum of Law, arguing that "Plaintiff . . . cannot establish any . . . bases for personal involvement with respect to Harris."  (Defs.' Mem of Law in Supp. of Their Mot. For Partial Summ. J. ("Defs.' Mem.") 8 (Dkt. No. 29).)  Specifically, Defendants state that it is "undisputed that . . . Harris did not participate in any of the sexual harassment alleged by Plaintiff[,] . . . there is no evidence that [Harris] was aware of any of the alleged sexual harassment suffered by Plaintiff[,] . . . [and] [i]nasmuch as she was unaware of such alleged

---

[4] The Supreme Court's decision in *Iqbal*, 556 U.S. at 676, "may have eroded *Colon* by limiting the ways in which personal involvement may be established, and the Second Circuit has not resolved the matter."  *Young v. Tyron*, No. 12-CV-6251, 2015 WL 309431, at *13 n.10 (W.D.N.Y. Jan. 23, 2015) (citing *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) and *Raspardo*, 770 F.3d at 117)); *see also McNaughton v. deBlasio*, No. 14-CV-221, 2015 WL 468890, at *5 n.8 (S.D.N.Y. Feb. 4, 2015) (explaining that "[c]ourts have disagreed as to whether the five *Colon* factors continue to apply after *Iqbal*" and collecting cases).  The Court need not resolve this issue, however, as even under the "more expansive *Colon* factors," Harris is entitled to the summary judgment on this claim.  *Young*, 2015 WL 309431, at *13 n.10; *see also White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 393 (S.D.N.Y. 2011) ("For the purposes of deciding this motion . . . it is not necessary for the [c]ourt to determine the outer reaches of supervisory liability, because the plaintiff has failed to present evidence of personal involvement under any of the *Colon* categories . . . .").

harassment, there is also no evidence that . . . [Harris] failed to take any steps to stop such sexual harassment." (*Id.*)

"'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" *Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).  Here, as noted, Plaintiff did not respond to Defendants' arguments on the § 1983 claim against Harris, and, therefore, the Court deems this claim abandoned and grants Defendants' Motion as to this claim. *See Carillos v. Inc. Village of Hemstead*, —F. Supp. 3d—, 2015 WL 728244, at *14 (E.D.N.Y. Feb. 20, 2015) (explaining that the plaintiff did not address the claim under § 1983 for supervisory liability in her opposition and, therefore, the court "deem[ed] it abandoned"); *Torres v. Nat'l R.R. Passenger Corp. d/b/a Amtrak*, No. 13-CV-233, 2014 WL 338739, at *2 (S.D.N.Y. Jan. 30, 2014) (granting summary judgment in favor of the defendant where the plaintiff "ha[d] not addressed or made any arguments in opposition to [the] [d]efendants' motion for summary judgment" on one of the plaintiff's claims); *Maher*, 650 F. Supp. 2d at 268 (granting the defendant's motion for summary judgment on the plaintiff's retaliation claim because the plaintiff "failed to address any of [the] [d]efendant's arguments regarding th[e] claim . . . [and] therefore [the court] deem[ed] [the] [p]laintiff's retaliation claim abandoned"); *Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. 06-CV-1947, 2009 WL 230708, at *9 (D. Conn. Jan. 30, 2009) (granting the defendants' motion for summary judgment where the plaintiffs failed to address the defendants' arguments with respect to the plaintiffs' First Amendment, malicious

prosecution, and statutory claims on the grounds that the "[p]laintiffs' failure to address [the defendants'] arguments in their opposition papers constitutes abandonment of the claims"); *cf. Felske v. Hirchmann*, No. 10-CV-8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his [or her] failure to respond to them.").

### 3. Section 1983 Liability for Retaliation

Defendants argue that "[t]o the extent Plaintiff attempts to base her Section 1983 claim on the alleged retaliation, it necessarily fails . . . against all Defendants." (Defs.' Mem. 3.) To begin, it is not clear whether a plaintiff may bring a claim for retaliation pursuant to § 1983. In *Bernheim v. Litt*, 79 F.3d 318 (2d Cir. 1996), the Second Circuit observed that "we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination," and accordingly held that "[g]iven the availability of Title VII, . . . we see no reason to break new constitutional ground." *Id.* at 323. In *Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010), however, the Second Circuit allowed a § 1983 claim to proceed on an equal protection theory because "[t]he premise of [the] lawsuit [was] that plaintiffs were treated differently—that is, they suffered retaliation—on the basis of their participation in discrimination investigations and proceedings." *Id.* at 171. "'*Hicks* did not cite to or discuss *Berheim*, and district courts within [the Second Circuit] have since noted that the viability of a § 1983 retaliation claim based on an equal protection theory remains unclear.'" *Giscombe v.*

*N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 405 (S.D.N.Y. 2014) (quoting *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 319 (E.D.N.Y. 2014)).[5]

The Court need not resolve this issue here.  Plaintiff does not respond in any way to Defendants' argument that her claim for retaliation should not proceed under § 1983.  Moreover, it is not clear from the Amended Complaint that Plaintiff brings a § 1983 claim on the basis of Defendants' alleged retaliatory conduct.  Accordingly, to the extent that Plaintiff states a claim for retaliation under § 1983, the Court deems this claim abandoned because Plaintiff did not address Defendants' arguments concerning this claim for the reasons explained above in reference to the § 1983 claim against Harris.

### C.  Section 1985 Claim

Count Two of Plaintiff's Amended Complaint alleges that "[a]ll Defendants conspired to deprive Plaintiff of her civil rights by engaging in a course of conduct together that facilitated Miller's sexual harassment of Plaintiff."  (Am. Compl. ¶ 75.)

"Title 42 U.S.C. § 1985(3) prohibits, in pertinent part, conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws.'"  *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290 (2d Cir. 1992) (quoting 42

---

[5] The Court notes that in an unpublished decision where both *Hicks* and *Bernheim* were discussed in the parties' briefing, the Second Circuit favorably cited *Hicks* to state the elements of a "retaliation claim under Title VII or § 1983."  *Lewis v. City of Norwalk*, 562 F. App'x 25, 29 (2d Cir. 2014).  Nevertheless, the Second Circuit did not discuss whether the plaintiff could sustain a separate claim for retaliation under § 1983, but instead concluded that the plaintiff "failed to establish a causal connection between the protected activity . . . and his termination." *Id.*

U.S.C. § 1985(3)).  "The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the

purpose of depriving, either directly or indirectly, any person or class of persons of equal

protection of the laws, . . . ; (3) an act in furtherance of the conspiracy; (4) whereby a person

is . . . deprived of any right of a citizen of the United States."  *Brown v. City of Oneonta*, 221

F.3d 329, 341 (2d Cir. 1999) (alterations in original) (internal quotation marks omitted); *see also*

*Bliss v. Rochester City Sch. Dist.*, 196 F. Supp. 2d 314, 337 (W.D.N.Y. Mar. 28, 2002) (same),

*aff'd* 103 F. App'x (2d Cir. 2004), *aff'd sub nom. Eaton v. Rochester City Sch. Dist.*,100 F.

App'x 855 (2d Cir. 2004), *aff'd sub nom. Coons v. Bd. of Educ. Of Rochester City Sch. Dist.*, 100

F. App'x (2d Cir. 2004).  "[A] plaintiff must provide some factual basis supporting a meeting of

the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the

unlawful end."  *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks

omitted).  "[A]n action will lie under § 1985(3) when a plaintiff is injured by a private

conspiracy to interfere with his [or her] constitutional rights, so long as there is some racial, or

perhaps otherwise class-based, indvidiously discriminatory animus behind the conspirators'

action."  *Jews for Jesus*, 968 F.2d at 290–91 (second alteration in original) (internal quotation

marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996) ("The conspiracy

must be motivated by racial or related class-based discriminatory animus.").[6]  "[C]laims of

---

[6] It is not clear whether discrimination based on gender qualifies as "class-based discriminatory animus" for the purpose of a conspiracy claim under § 1985(3).  In *New York State National Organization for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989), the Second Circuit held that "women may constitute a class for purposes of § 1985."  *Id.* at 359. Subsequently, after the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), which held that "[w]omen seeking abortion" was not a qualifying class under § 1985(3), *id.* at 269, the Second Circuit declined to consider whether women in general

conspiracy that are vague and provide no basis in fact must be dismissed." *Van Dunk v. St. Lawrence*, 604 F. Supp. 2d 654, 663 (S.D.N.Y. 2009) (internal quotation marks omitted).

Here, Plaintiff argues that she has presented evidence to show that a "meeting of the minds" occurred among Coker-Wiggins, Harris, and Miller. First, Plaintiff points to the testimony of Abel, who stated that she informed Coker-Wiggins of Plaintiff's sexual harassment claims. (Pl.'s Mem. 9–10.) This testimony, however, only supports the finding that that Coker-Wiggins knew of the sexual harassment—not that there was a conspiracy to sexually harass Plaintiff. Next, Plaintiff points to the statements of Rasul Salahuddin ("Salahuddin") that Salahuddin spoke with Nichelle Johnson ("Johnson") about Plaintiff's complaints at they were made. (*Id.* at 10.) Specifically, Salahuddin states that he spoke with Johnson, who was the "acting counsel for the City of Mt. Vernon City Council," that he was "personally involved in conversations with . . . Johnson wherein she was informed about the sexual harassment . . . Miller was engaging in," and that there were several conversations that "involved [himself], . . . Johnson[,] and . . . Cowan[,] during which . . . Johnson was directly informed by . . . Cowan about . . . Miller's sexual harassment." (Aff. of Rasul Salahuddin ("Salahuddin Aff.") ¶¶ 5–6 (Dkt. No. 46).) Again, these statements do not support a finding of conspiracy

---

constituted a protected class under § 1985(3). *See Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993) ("We find it unnecessary to decide whether [women in general] is a qualifying class under § 1983."). The Court need not, however, decide whether gender constitutes a protected class under § 1985(3) because assuming that it does, Plaintiff's conspiracy claim nevertheless fails for the reasons discussed herein. *See Rosenberg v. City of New York*, No. 09-CV-4016, 2011 WL 4592803, at *12 n.4 (E.D.N.Y. Sept. 30, 2011) (declining to decide the question of whether the plaintiff could state a claim under § 1985 based on gender discrimination because "the [c]ourt [found] that [the] plaintiff's claim should be dismissed for [other] reasons").

36

among Coker-Wiggins, Harris, and Miller that Plaintiff seeks to establish.  At most, they show that certain Mount Vernon officials not named as Defendants here were informed of Miller's misconduct.  "Mere knowledge, however, is insufficient to sustain a claim of conspiracy under § 1985(3)."  *Peck v. United States*, 470 F. Supp. 1003, 1012 (S.D.N.Y. 1979).

Plaintiff has also presented an affidavit from Antoine Lowe ("Lowe"), the Commissioner of Civil Defense for the City, in which Lowe states that he informed the mayor of the City of Plaintiff's claims in January 2011 and that he was personally informed that a meeting was held at which Plaintiff's claims were addressed.  (Aff. of Antoine Lowe ("Lowe Aff.") ¶¶ 1, 3–5, 9 (Dkt. No. 45).)  Specifically, Lowe states that Coker-Wiggins "told him that she had a meeting at which . . . Miller and . . . Harris were present" and that "there were specific discussions about . . . Cowan's allegations . . . [and that] Miller denied that he had exposed himself to . . . Cowan."  (Lowe Aff. ¶ 9.)[7]  Lowe also states that he "understand[s] that . . . Miller and . . . Harris deny learning that . . . Cowan came forward about the terrible things . . . Miller did to her until a Notice of Claim was filed with the City" and that he "personally know[s] this to be untrue as . . . Coker-Wiggins made [him] aware of meetings concerning . . . Cowan in January 2011 at which . . . Miller and . . . Harris were present."  (*Id.* ¶ 12.)

Defendants argue that Plaintiff cannot rely on Lowe's statements as evidence that a meeting between Harris, Miller, and Coker-Wiggins occurred because his statements are hearsay.

---

[7] Based on the chronology laid out in Lowe's Affidavit, it appears that this meeting happened no earlier than January 2011, as Lowe said he learned about the meeting after hearing about the alleged incident in January 2011 involving Miller locking Plaintiff in an office at the high school.  (Lowe Aff. ¶¶ 3–9.)

(Defs.' Reply Mem. of Law In Further Supp. of Their Mot. For Partial Summ. J. ("Defs.' Reply") 8–9 (Dkt. No. 52).)  "It is appropriate for a district court ruling on summary judgment to consider only admissible evidence." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001).  The statement that Coker-Wiggins made to Lowe implicates hearsay concerns because it is offered for the truth of the matter asserted.  Nevertheless, the statement may qualify as a statement of a party opponent under Rule 801(d)(2)(D), which provides that a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  To establish the statement is not hearsay under this exception, Plaintiff must show "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996) (internal quotation marks omitted).  "The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992); *see also Holleman v. Art Crating Inc.*, No. 12-CV-2719, 2014 WL 4907732, at *24 (E.D.N.Y. Sept. 30, 2014) (same).  Here, there is no doubt that Coker-Wiggins, as an employee of the City, was an agent of the City and that her statement was made during the course of her employment.  Moreover, because Coker-Wiggins was the Commissioner of Human Resources, she had "the authority to take action about which the statements relate," *Pappas*, 963 F.2d at 538, specifically authority to address allegations of sexual harassment.  Accordingly, the Court will consider

Coker-Wiggins's statement as a statement of a party opponent for the purpose of resolving the instant Motion.

Nonetheless, even considering Lowe's statement that Coker-Wiggins told him about a meeting between herself, Harris, and Miller that had occurred, Plaintiff has failed to present evidence of a conspiracy to violate her rights that is motivated by discriminatory animus.  The fact of a meeting between some Defendants is insufficient to establish a conspiracy.  Plaintiff offers no factual basis that Defendants "entered into an agreement, express or tacit, to achieve [an] unlawful end."  *Webb*, 340 F.3d at 110 (internal quotation marks omitted).  Indeed, based on Lowe's description, this meeting took place after the majority of the alleged harassment by Miller, and even Lowe's account of the meeting suggests that there was no meeting of the minds by Coker-Wiggins, Miller, and Harris to sexually harass Plaintiff.  Moreover, as noted, "[m]ere knowledge" of Miller's sexual harassment "is insufficient to sustain a claim of conspiracy under § 1985(3)."  *Peck*, 470 F. Supp. at 1012.  Accordingly, Plaintiff has failed to proffer evidence to support a conspiracy for purposes of § 1985(3) liability and, therefore, this claim cannot stand. *See Van Dunk*, 604 F. Supp. 2d at 663 (granting the defendants' motion for summary judgment on the plaintiff's § 1985(3) claim because the plaintiff failed "to allege any facts that would suggest a meeting of the minds took place between [the defendants]"); *Rosendale v. Brusie*, No. 07-CV-8149, 2009 WL 778418, at *22 (S.D.N.Y. Mar. 25, 2009) ("[T]he mere fact that [the] [d]efendants are involved in the events of which [the plaintiff] complains does not establish a conspiracy." (internal quotation marks omitted)); *Hawkins v. County of Oneida*, 497 F. Supp. 2d 362, 379 (N.D.N.Y. 2007) (granting the defendant's motion for summary judgment on the

plaintiff's § 1985 claim because the plaintiff "alleged in generic and conclusory terms that [the]

defendants conspired for the purpose of depriving plaintiff of the equal protection of the

laws . . . [and] produced no evidence which show[ed] that any of the defendants conspired or

arrived at some sort of agreement to deprive him of his civil rights" (internal quotation marks

omitted)); *Thomas v. Bergdorf Goodman, Inc.*, No. 03-CV-3066, 2004 WL 2979960, at *11

(S.D.N.Y. Dec. 22, 2004) (dismissing the plaintiff's § 1985(3) claim because "there is no

evidence of a conspiracy among members of [the plaintiff's employer]"); *Bliss*, 196 F. Supp. 2d

at 338 (granting the defendants' motion for summary judgment because "plaintiffs have offered

no evidence suggesting that the . . . defendants conspired together in violation of § 1985(3)" and

because "[r]ather than proffer evidence, [the] plaintiffs merely rest[ed] on their allegations[,]"

which was insufficient at the motion for summary judgment stage).

Even assuming that Plaintiff has adequately alleged a Section 1985 conspiracy, this claim

is barred as a matter of law.  "Under the intracorporate conspiracy doctrine, officers, agents[,]

and employees of a single corporate entity are legally incapable of conspiring together."

*Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 291 (E.D.N.Y. 2010) (internal quotation

marks omitted)); *see also Guichard v. Town of Brookhaven*, 26 F. Supp. 3d 219, 227 (E.D.N.Y.

2014) (same); *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 414 (S.D.N.Y. 1998) (same).

Miller, Coker-Wiggins, and Harris were all employees of the City.  Plaintiff thus does not contest

that Defendants were "employees of a single corporate entity."  *Castanza*, 700 F. Supp. 2d at 291

(internal quotation marks omitted); *see also Salgado v. City of New York*, No. 00-CV-3667, 2001

WL 290051, at *9 (S.D.N.Y. Mar. 26, 2011) ("All of the individual [d]efendants are officers,

40

agents, and employees of a single corporate entity, the City of New York.").  Rather, Plaintiff

states that the intracorporate conspiracy doctrine does not apply.

      "An exception to the intracorporate conspiracy doctrine applies to individuals within a

single entity when they are pursuing personal interests wholly separate and apart from the

entity."  *Castanza*, 700 F. Supp. 2d at 292 (internal quotation marks omitted); *see also Salgado*,

2001 WL 290051, at *8 ("There is a 'personal interest' or 'personal stake' exception to the

intracorporate conspiracy doctrine, . . . which permits a § 1985 claim where there are individuals

who are 'motivated by an independent personal stake in achieving the corporation's objective.'"

(quoting *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976)).  Plaintiff claims

that Defendants acted outside the scope of their employment and to pursue their personal

interests, rather than the interests of the City, because "Harris sought to preserve the integrity of

the [Y]outh Bureau and protect Miller, who was, at the very least, her confidant; Miller sought to

avoid discipline and protect his job; and Coker-Wiggins sought to avoid exposure of the

unlawful advice she provided Plaintiff as well as to bolster her bona fides with regard to the

newly established Human Resources Department."  (Pl.'s Mem. 9.)  Plaintiff has not proffered

any evidence, however, to support these claims, and she may not rely on unsupported assertions

to defeat a motion for summary judgment.  *See Heublein, Inc.*, *v. United States*, 996 F.2d 1455,

1461 (2d Cir. 1993) ("[T]here must be more than a scintilla of evidence in the non-movant's

favor; there must be evidence upon which a fact-finder could reasonably find for the non-

movant." (internal quotation marks omitted)); *see also Wall v. Chelsea Plastics*, No. 07-CV-

7549, 2008 WL 2037079, at *2 (S.D.N.Y. May 9, 2008) ("Unsupported allegations in the

pleadings . . . cannot create a material issue of fact.").  Accordingly, the doctrine of

intracorporate conspiracy applies and bars Plaintiff's § 1985 claim against Defendants.  *See*

*Castanza*, 700 F. Supp. 2d at 292 (granting the defendants' motion for summary judgment as to

the plaintiff's § 1985 claim because the "[p]laintiff ha[d] not proffered any evidence indicating

that [the] [d]efendants acted outside the scope of their employment or that the alleged wrongful

acts of [the] [d]efendants were undertaken to pursue personal interests that were independent of

the [t]own"); *Aggarwal v. N.Y.C. Health & Hosp. Corp.*, No. 98-CV-5063, 2000 WL 172787, at

*9 (S.D.N.Y. Feb. 10, 2000) (granting the defendants' motion for summary judgment because

the plaintiff failed to offer evidence that the relevant defendant was acting outside the scope of

her employment).

### D.  Retaliation Claims

Count Four of the Amended Complaint alleges that Defendants retaliated against Plaintiff

for activity protected by Title VII and the NYSHRL.  (Am. Compl. ¶¶ 82–91.)  Title VII

prohibits discrimination against an employee "because he [or she] has opposed any practice

made an unlawful employment practice."  42 U.S.C. § 2000e-3(a).  The NYSHRL similarly

prohibits an employer from "discharg[ing] or otherwise discriminat[ing] against any person

because he or she has opposed any practices forbidden under [§ 296]."  N.Y. Exec. Law

§ 296(3-a)(c).  Courts analyze claims for retaliation pursuant to Title VII and NYSHRL under

the familiar three-part framework set forth by the Supreme Court in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802–04 (1973).  *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d

Cir. 2014) (Title VII claim); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)

("Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*.").  "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination."  *Abrams*, 764 F.3d at 251.  "The employee at all times bears the burden of persuasion to show retaliatory motive."  *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).

### 1.  Prima Facie Case

The Second Circuit has identified four elements for a prima facie case of retaliation: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against [the] plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."  *Weixel v. Bd. of Educ. Of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted).

Regarding the first element of a prima facie case, "[w]hile . . . protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, the Second Circuit has recognized that 'protected activity' includes 'informal protests of discriminatory employment practices, including making complaints to management.'"  *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)) (citation omitted); *see also Giscombe*, 39 F. Supp. 3d at 401

43

("Informal complaints to supervisors, instituting litigation, or filing a formal complaint are protected activities under Title VII." (internal quotation marks omitted)); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that informal complaints to supervisors constitute protected activity under Title VII." (internal quotation marks omitted)).  "[S]uch informal complaints[,] [however] must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII."  *Risco*, 868 F. Supp. 2d at 110 (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)).

Defendants contend that although "[i]t is not disputed that Plaintiff made numerous workplace/management-type complaints about . . . Miller during her time working as a Project Coordinator," those complaints do not constitute a protected activity.  (Defs.' Mem. 16.) Plaintiff testified, however, that she continually reported Miller's conduct to Coker-Wiggins and attempted to make a formal complaint concerning Miller's sexual harassment on numerous occasions.  (Pl.'s 56.1 ¶¶ 52, 68; Cowan Tr. 124, 132, 178, 201–02, 234–37, 265–72.) Specifically, Plaintiff testified that in August 2010, she "started talking to people at the Youth Bureau," including Coker-Wiggins, about Miller's "daily comments," his "touching [her] daily," and his "sexual conduct."  (Cowan Tr. 124–125.)  Plaintiff also testified that she had "been telling people [about the harassment] the whole time," (*id.* at 202), and that she informed Coker-Wiggins about Miller exposing himself to her, (*id.* at 236).  Plaintiff testified that in January, she told Coker-Wiggins that she wanted to make a formal complaint.  (Cowan Tr. 266.)  Plaintiff stated that she drafted an initial complaint on March 24, 2011 in Coker-Wiggins's office that

included allegations of sexual harassment against Miller, and that after Coker-Wiggins read the draft she instructed Plaintiff "to take . . . the sexual harassment component out of [her] complaint and stick to hostile work environment, things that [she] [could] prove." (Cowan Tr. 267–69.) These informal complaints, which were clearly about Miller's sexual harassment, constitute protected activity.

Plaintiff also has established an issue of material fact as to whether Harris knew that Plaintiff was engaged in protected activity. There is no dispute that Harris made the final decision to terminate Plaintiff's employment. (Defs.' 56.1 ¶ 25; Harris Aff. ¶¶ 18–19.) However, Defendants contend that Harris was not aware of any sexual harassment complaint made by Plaintiff, but this is contradicted by Lowe, who states that Coker-Wiggins told him that she met with Miller and Harris and that they discussed "Cowan's allegations and that . . . Miller denied that he had exposed himself to . . . Cowan." (Lowe Aff. ¶ 9.) Lowe also states that he "understand[s] that . . . Miller and . . . Harris deny learning that . . . Cowan came forward about the terrible things . . . Miller did to her until a Notice of Claim was filed with the City" and that he "personally know[s] this to be untrue as . . . Coker-Wiggins made [him] aware of meetings concerning . . . Cowan in January 2011 at which . . . Miller and . . . Harris were present." (*Id.* ¶ 12.) These statements create an issue of material fact that as to whether Harris was aware of Plaintiff's complaints against Miller, which cannot be resolved on a motion for summary judgment.[8]

---

[8] Moreover, "for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong." *Zann Kwan*, 737 F.3d at 844 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)); *see also Rumsey*

As to the third element, Plaintiff's termination constituted an adverse employment action. *See McCoy v. Morningside at Home*, No. 11-CV-2575, 2014 WL 737364, at *5 (S.D.N.Y. Feb. 25, 2014) (explaining that to "establish an adverse employment action, a plaintiff must demonstrate that she suffered from a materially adverse change in the terms, privileges, duration[,] and conditions of employment," which includes "a termination of employment" (internal quotation marks omitted)).  Accordingly, the Court turns to whether Plaintiff has presented any evidence to suggest that "a causal connection exist[ed] between the protected activity and the adverse action." *Weixel*, 287 F.3d at 148 (internal quotation marks omitted). "[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse actions can be sufficient to establish causation.").  Here, Plaintiff began complaining of Miller's sexual harassment in August 2010 (Am. Compl. ¶ 24), and she attempted to file a formal complaint against him on those grounds on March 24, 2011, (Cowan Tr. 266).  Plaintiff was terminated on March 28, 2011, just days after speaking to Coker-Wiggins about filing the formal complaint with the sexual harassment allegations, and three days after she filed the formal complaint against Miller for a hostile work environment.  (Defs.' 56.1 ¶ 53; Cowan Tr. 285–86;

---

*v. NE Health, Inc.*, —F. Supp. 3d—, 2015 WL 791794, at *13 (N.D.N.Y. Feb. 25, 2015) (same). Here, there is no dispute that other employees of the City knew about Plaintiff's claims of sexual harassment.

*Id.* at Ex. 4; Coker-Wiggins Tr. 117; *Id.* at Ex. 3.)  Courts have considered longer gaps in time between the last protected activity and the adverse employment action than the gap here to be sufficient to establish causation for a prima facie case of retaliation.  *See Treglia*, 313 F.3d at 721 (concluding that "[t]he temporal proximity between this protected activity in February 1998 and the allegedly adverse employment actions in March 1998 [was] sufficient to establish the required causal link for a prima facie case"); *Gomez v. Metro. Dist.*, 10 F. Supp. 3d 224, 237 (D. Conn. 2014) (finding that the "temporal proximity between [the plaintiff's] request for a release of jurisdiction and his termination three weeks later [was] sufficiently close for a prima facie retaliation case"), *reconsideration denied*, No. 11-CV-1934, 2014 WL 2765987 (D. Conn. June 18, 2014); *cf. Baron v. Advanced Asset & Prop. Mgmt. Solutions, LLC*, 15 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) (finding the fact that a remark regarding the plaintiff's disability was made approximately six weeks prior to the plaintiff's termination supported that a "reasonable trier of fact could infer that [the] defendant discriminated against [the] plaintiff because of his disability").  Accordingly, Plaintiff has established a prima facie case of retaliation.

### 2.  Non-Discriminatory Reasons

Turning to the second step of the burden-shifting analysis, the Court concludes that Defendants have proffered evidence of non-discriminatory reasons for Plaintiff's termination. Defendants claim that "[t]he evidence in this case shows that although there were no 'major problems' with Plaintiff's performance prior to her appointment as a Project Coordinator . . . , after she took on the expanded duties of [this] position, there was a 'build up' and a 'progression of issues' with her performance."  (Defs.' Mem. 19–20.)  Specifically,

Defendants state that "[a]lthough a large part of [Plaintiff's] job responsibility was to recruit students to [STRONG], [Plaintiff] failed to do so . . . [and] [h]er failure contributed to [STRONG] failing to provide programming to the number of students required by its funding grant, and put [STRONG] at grave risk of losing funding for its continued existence." (Defs.' Mem. 20; s*ee also* Harris Aff. ¶¶ 10–11; Harris Tr. 132, 171–72, 200, 205; Miller Tr. 10–11, 113, 123–24.) Moreover, Harris believed that Plaintiff exercised poor judgment and exposed the City to potential litigation by allowing Sasha Blake, who had not been interviewed or hired, to work as a substitute teacher with STRONG for several days, which resulted in Blake demanding payment and Harris, among others, needing to resolve the situation. (Defs.' Mem. 20; Harris Tr. 132; Harris Aff. ¶¶ 12–13.) Harris also testified that she believed that Plaintiff had falsely reported to her that Miller demanded that she return the keys to the STRONG office and the laptop computer that she used because he wanted to fire her. (Defs.' Mem. 21; Harris Tr. 156–57; Harris Aff. ¶ 14.) Harris believed that what actually had occurred was that Miller requested Plaintiff to give him the key to a file cabinet in the office where the "Metro cards" were stored so that he could distribute the cards to the STRONG students, and that Miller requested that the laptop to have it fixed. (Defs.' Mem. 21; Harris Tr. 156–57; Harris Aff. ¶ 14.) Finally, Defendants claim that as Project Coordinator, Plaintiff was entrusted with keys to the [STRONG] office and that Plaintiff "exposed the City and Mount Vernon City School District to financial loss by not locking the [STRONG] office and leaving her keys . . . on her desk where they could have been taken by anyone who happened to walk by." (Defs.' Mem. 21.) Harris testified that Plaintiff failed to advise her that she left the office and keys unsecured, and would

neither answer nor return her phone calls about the situation. (Harris Tr. 155–60, 170, 223; Harris Aff. ¶ 16.) According to Harris, because Plaintiff could not be located, new locks had to be installed on the STRONG office doors. (Harris Aff. ¶ 16.) In short, Harris testified that Plaintiff "was terminated based on [her] performance issues, and then finally the incident . . . with the keys and the exposure to the program." (Harris Tr. 173.) In light of Harris's testimony, which supports that Plaintiff's termination was due to reasons other than her complaints of sexual harassment, Defendants have satisfied their burden at step two of the *McDonnell Douglas* framework.

### 3.  Pretext

"The Supreme Court recently held that a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845–46 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 (2013)). "But-for" causation, however, "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action[,] [as] [f]rom such discrepancy, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* Moreover, the Court notes that the Second Circuit has cautioned that "[t]he determination of whether retaliation was a 'but-for' cause . . . is particularly poorly

suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Id.* at 846 n.5.

Here, Plaintiff states that "despite all of the things that Defendants point to [that] occurred over the duration of [Plaintiff's] employment, none of the cited incidents led to discipline of any kind and the record is utterly devoid of any discipline with regard to [Plaintiff]." (Pl.'s Mem. 16.) Further, Plaintiff highlights that the monthly reports on the STRONG program from November 2009 to June 2011 make no mention of Plaintiff's deficiencies, but rather state that Plaintiff "appears to have the skill set and ability to do the coordinator job," (Leavitt Aff. Ex. 1, at 1073), that she "has had a very positive impact on the program and is very impressive, (*id.* at 1079), and that she has "initiated various school collaborations, (*id.* at 111). Although the purpose of these reports was not to evaluate Plaintiff's performance, the statements therein coupled with the fact that Defendants point to no disciplinary action or negative performance reviews prior to Plaintiff's termination, suggest "weaknesses . . . [and] inconsistencies," *Zann Kwan*, 737 F.3d at 846, in Defendants' proffered reason that there was a "build up" and a "progression of issues" with Plaintiff's performance, (Defs.' Mem. 20) that led to her termination.[9]

---

[9] Moreover, although Harris testified that she was concerned with the number of students that STRONG registered, one of the reports states that "[o]ne of the on-going challenges that the . . . STRONG Program continues to face is a low attendance rate in comparison to the number of students that have signed up and are registered for the program." (Leavitt Aff. Ex. 1, at 1117.) This report identifies, then, that attendance and not enrollment, was a problem for STRONG. "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846.

50

Further, while temporal proximity alone is insufficient to defeat summary judgment at the pretext stage, *see El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam), "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage," *Zann Kwan*, 737 F.3d at 847.  Again, Plaintiff was terminated only days after she attempted to file a formal complaint of sexual harassment against Miller, and three days after she filed a formal complaint alleging a hostile work environment.  Moreover, Plaintiff testified that the day she submitted her hostile work environment claim against Miller, Coker-Wiggins informed her that "it would be better for everyone if you didn't come back." (Pl.'s 56.1 ¶ 25; Cowan Tr. 272.)  Accordingly, based on the fact that Defendants point to no negative performance reviews or indication that Plaintiff's performance was deficient, the fact that the only contemporaneous evidence of Plaintiff's performance is positive, and the temporal proximity between Plaintiff's attempt to file a formal complaint and her termination, a reasonable juror could conclude that Defendants' proffered reasons are pretextual and the protected activities were a but-for cause of Plaintiff's termination.  *See Zann Kwan*, 737 F.3d at 847 ("Based on the discrepancies between the EEOC statement and subsequent testimony, a reasonable juror could infer that the explanation given by the defendant was pretextual, and that, coupled with the temporal proximity between the complaint and the termination, the . . . complaint was a but-for cause of [the plaintiff's] termination"); *Dillon v. Ned Mgmt., Inc.*, —F. Supp. 3d—, 2015 WL 427921, at *18 (E.D.N.Y. Feb. 2, 2015) (holding that the plaintiff had satisfied her burden with respect to pretext because, among other things, the

51

defendants "fail[ed] to present credible evidence that [the plaintiff] had been informed before her date of termination that lateness was a problem" and the evidence "primarily consist[ed] of contradictory deposition testimony," which made summary judgment inappropriate).

### E.  Intentional Infliction of Emotional Distress

Count Ten seeks damages against Miller for intentional infliction of emotional distress ("IIED").  Under New York Law, to establish a cause of action for IIED, a plaintiff must prove: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *Carroll v. Bayerische Landesbank*, 150 F. Supp. 2d 531, 538 (S.D.N.Y. 2001) (citing *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). Plaintiff's claim for IIED presents two issues: first, whether the conduct alleged satisfies the standard of extreme and outrageous conduct, and second, whether an IIED claim is available here because Plaintiff has brought claims covered by the NYSHRL based on the same conduct.

The IIED tort "provides a remedy for the damages that arise out of a defendant engaging in 'extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civil society.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (quoting *Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 355 (N.Y. 1985)).  "The standard for extreme and outrageous conduct is extremely difficult to satisfy." *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 440 (S.D.N.Y. 1998) (collecting cases); *see also Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) ("[T]he standard for stating a valid claim of intentional infliction of emotional distress is rigorous, and difficult to satisfy."

(internal quotation marks omitted)).  Indeed, in *Howell*, the New York Court of Appeals noted that "every one [of the IIED tort claims considered by the Court] ha[d] failed because the alleged conduct was not sufficiently outrageous."  *Howell*, 612 N.E.2d at 702.

"In the rare instances where the New York courts have found the complaint sufficient to state a claim for intentional infliction of emotional distress in the employment context, the claims have been accompanied by allegations of sex discrimination, and more significantly, battery." *Daniels v. Health Ins. Plan of Greater N.Y.*, No. 02-CV-6054, 2005 WL 1138492, at *3 (S.D.N.Y. May 12, 2005) (internal quotation marks omitted)); *see also Pepe v. Maklansky*, 67 F. Supp. 2d 186, 187 (S.D.N.Y. 1999) ("For example, a New York appellate court found that while 'a hard slap on [the] [plaintiff's] backside,' during an outburst of rage by the individual defendant stated a cause of action for assault and battery, it fell short of 'the rigorous standard of outrageous conduct necessary to maintain a cause of action for intentional infliction and emotional distress.'" (second alteration in original) (quoting *Jaffe v. Nat'l League for Nursing*, 635 N.Y.S.2d 9, 10 (App. Div. 1995) (some internal quotation marks omitted)); *Ponticelli*, 16 F. Supp. 2d at 440–41 ("In the sexual harassment context, it appears that for an IIED claim to survive a summary judgment motion, sexual battery should be alleged."); *cf. Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 631 (E.D.N.Y. 2012) ("Where, as here, the plaintiff premises an intentional infliction of emotional distress claim on harassment, discrimination, or retaliation in the employment context, New York courts are particularly reluctant to find that such conduct is sufficiently extreme or outrageous to satisfy this demanding standard 'absent a deliberate and

malicious campaign against the plaintiff.'" (quoting *Fertig v. HRA Med. Assistance Program*, No. 10-CV-8191, 2011 WL 1795235, at *6 (S.D.N.Y. May 6, 2011)).

Here, Miller's conduct, as alleged and not challenged for the purpose of this Motion, is extreme and outrageous. Plaintiff not only alleges pervasive sexual harassment, but instances of battery. Specifically, Plaintiff alleges that Miller physically touched Plaintiff in a sexual manner, including feeling her back, pinching her buttocks, slapping and/or squeezing her buttocks, grabbing her chest, and rubbing his crotch against her. (Am. Compl. ¶¶ 27, 63.) Moreover, when Miller locked Plaintiff into his office and exposed his penis to her, Miller pushed Plaintiff away from the door and blocked her from leaving. (*Id.* ¶¶ 51–53.) These instances of battery, many of which Plaintiff alleges were repeated over nearly a year-long period, constitute extreme and outrageous conduct for the purpose of an IIED claim. *See T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 860367, at *12 (S.D.N.Y. Feb. 27, 2012) ("[B]ecause plaintiff has alleged a sexual battery involving [the defendant], the [c]ourt will permit the emotional distress claims to proceed against her."); *Salvatore v. KLM Royal Dutch Airlines*, No. 98-CV-2450, 1999 WL 796172, at *3 (S.D.N.Y. Sept. 30, 1999) (holding that the allegations that the defendant "dropped a pencil between [one plaintiff's] breasts, pushed her to the floor on two separate occasions and 'frequently' massaged her neck between January 19997 and October 1997" and allegations of another plaintiff that the defendant "rubbed his crotch against [his] arm in a sexual fashion on 'numerous occasions' while calling him 'cute'" were sufficient to state IIED claims); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 491 (S.D.N.Y. 1999) (noting that "[c]ourts have observed that a plaintiff must allege sexual battery in

order to survive a motion for summary judgment in the sexual harassment context" and holding that "[b]y claiming that [the defendant] groped her breast, [the plaintiff] has raised an issue of fact as to whether [the defendant's] conduct [rose] to the level [of extreme conduct] demanded under New York law"); *cf. Daniels*, 2005 WL 1138492, at *3 (dismissing IIED claim where the plaintiff failed to "allege battery, sexual harassment, or sex discrimination").

Defendants do not address whether Miller's conduct is extreme and outrageous. Instead, Defendants argue that because Plaintiff brings statutory claims against Miller for sexual harassment and the retaliatory termination of her employment, Plaintiff's IIED claim must be dismissed. (Defs.' Mem. 24–25.) In other words, Defendants claim that because the conduct Plaintiff complains of is addressed by the NYSHRL, an IIED cause of action will not lie.

"[A]lthough the New York Court of Appeals has not set forth detailed guidelines for when the tort may be available, it has cautioned that a claim for IIED may not be sustainable 'where the conduct complained of falls well within the ambit of other traditional tort liability.'" *Turley*, 774 F.3d at 159 (quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978)). Accordingly, "some New York courts have determined that plaintiffs may not bring claims for IIED when the conduct and injuries alleged give rise to a statutory claim for workplace discrimination." *Id.* at 159–60 (collecting cases); *see also Lopez v. City of New York*, No. 14-CV-1660, 2014 WL 5090041, at *4 (S.D.N.Y. Oct. 10, 2014) ("New York law considers IIED a theory of recovery that is to be invoked only as a last resort, and requires dismissal of an IIED claim based on conduct that falls within the ambit of other tort liability." (citation and internal quotation marks omitted)); *Audrey v. Career Inst. of Health & Tech.*, No. 06-CV-5612, 2014 WL

2048310, at *3 (E.D.N.Y. May 18, 2014) (same); *Semper v. N.Y. Methodist Hosp.*, 786 F. Supp.

2d 566, 588 (E.D.N.Y. 2011) (dismissing IIED cause of action based on discriminatory conduct);

*Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 424 (E.D.N.Y. 2010) (noting that

employment discrimination conduct does not make out a claim for IIED); *cf. Yang Feng Zhao v.*

*City of N.Y.*, 656 F. Supp. 2d 375, 405 (S.D.N.Y. 2009) (holding that because "the alleged

conduct fits well within the traditional tort theories of false arrest, malicious prosecution, and

assault and battery. . . the claim of intentional infliction of emotional distress will not fly").  The

Second Circuit has explained:

> There are at least two possible rationales for this approach.  One would preclude
> IIED claims on the ground that they would permit an end-run around the New
> York legislature's prohibition on punitive damages for violations of the state
> Human Rights Law.  Another would preclude IIED claims in the face of valid
> statutory or common-law claims based on the nature of the IIED tort itself as a
> tort of last resort, rather than any independent effect wrought by the state statute.

*Turley*, 774 F.3d at 159 n.19 (citation and internal quotation marks omitted).

Other courts, however, have determined that "sexual harassment can give rise to a claim

for intentional infliction of emotional distress."  *Carroll*, 150 F. Supp. 2d at 538 (dismissing

IIED claim because the "alleged conduct [was] not extreme and outrageous as a matter of law");

*see also Funk v. F&K Supply, Inc.*, 43 F. Supp. 2d 205, 220 (N.D.N.Y. 1999) ("[T]he majority

view of the New York courts, along with nearly every federal court, is that sexual harassment

can give rise to a claim under New York law for IIED."); *Polley v. Fed. Reserve Bank*, No.

92-CV-7114, 1994 WL 465923, at *7 (S.D.N.Y. Aug. 23, 1994) ("New York courts have found

that sexual harassment claims based on a pattern of harassment may give rise to intentional

infliction of emotional distress claims by virtue of being intolerable conduct.").  These courts

56

have provided little rationale as to why an IIED claim may stand in light of the availability of statutory causes of action. The Second Circuit has surmised, however, that barring IIED claims in circumstances such as these would preclude plaintiffs from recovering "punitive damages which might otherwise appear to be warranted." *Turley*, 774 F.3d at 160. Indeed, the NYSHRL does not provide for punitive damages, *see Syrnik v. Polones Constr. Corp.*, 918 F. Supp. 2d 262, 265 (S.D.N.Y. 2013); *Beebe v. N.Y. Times Co.*, 666 F. Supp. 2d 321, 330 (E.D.N.Y. 2009), whereas an IIED claim allows for recovery of punitive damages, *see Decter v. Second Nature Therapeutic Program, LLC*, 42 F. Supp. 3d 450, 463 (E.D.N.Y. 2014); *Funk*, 43 F. Supp. 2d at 218.

In the end, it is an open question "whether, under New York law, [a] plaintiff [is] flatly barred from maintaining a common-law 'gap-filler' claim for IIED alongside his [or her] statutory claim for workplace discrimination arising out of the same conduct and alleging the same injury." *Turley*, 774 F.3d at 160. The Second Circuit has noted that for "any . . . court[] to decide the issue, it would . . . be confronted with a choice between the general perils associated with the invocation of this tort and the substantial effect that ruling out IIED claims might have on the ability of some harassment plaintiffs to recover punitive damages which might otherwise appear to be warranted." *Id.* These considerations would likely implicate public policy concerns and value judgments and, accordingly, the Second Circuit suggested that were it confronted with the question, it would certify it to the New York Court of Appeals. *See id.*

While a decision by the New York Court of Appeals would settle the issue, "[i]n the absence of any plain ruling by a state's highest court, the rulings of the intermediate state courts

'are entitled to persuasive, if not decisive consideration.'" *Weissman v. Dow Corning Corp.*, 892 F. Supp. 510, 515 (S.D.N.Y. 1995) (quoting *Sphere Drake Ins. Co. v. P.B.L. Entm't, Inc.*, 30 F.3d 21, 23 (2d Cir. 1994), *vacated on other grounds*, 52 F.3d 22 (2d Cir. 1995)).  Here, the Court is guided by the First Department's decision in *McIntyre v. Manhattan Ford, Lincoln Mercury*, 682 N.Y.S.2d 162 (App. Div. 1998.).  The Court in *McIntyre* explained that "[t]he tort of intentional infliction of emotional distress is a departure from the common law," and "[d]evelopment of the tort reflects the acknowledgment by the courts of the need to afford relief where traditional theories of recovery do not." *Id.* at 169 (citing *Howell*, 612 N.E.2d at 701–03)).  IIED, therefore, "is to be invoked only as a last resort." *Id.*; *see also Turley*, 774 F.3d at 158 (same); *Charney v. Sullivan & Cromwell LLP*, No. 100625/2007, 2007 WL 2822423, at *2 (N.Y. Sup. Ct. Sept. 27, 2007) (same).  Accordingly, the *McIntyre* Court held that because "emotional damages are available under the theories of sexual harassment and retaliatory discharge pursuant to [NYHRL]" that "there is no reason to apply the theory [of IIED] where an applicable statute expressly provides for the recovery of damages for emotional distress." *McIntyre*, 682 N.Y.S.2d at 169.  The First Department has since reaffirmed this holding. *See Conde v. Yeshiva Univ.*, 792 N.Y.S.2d 387, 389, (App. Div. 2005) ("Plaintiffs' claim for intentional infliction of emotional distress should . . . have been dismissed as against [the defendant], where their remedy for damages has been preserved in the surviving statutory claims for sexual harassment and retaliation").  Moreover, in considering whether a plaintiff could sustain a claim for IIED based on allegations of sexual harassment, the Fourth Department has held that "such a cause of action does not lie where, as [in the action under consideration], the

conduct complained of *falls well within* the ambit of other traditional tort liability." *Baliva v. State Farm Mut. Auto. Ins. Co.*, 730 N.Y.S.2d 655, 657 (App. Div. 2001) (internal quotation marks omitted) (emphasis in original).[10]  In light of these decisions and an absence of a definitive ruling from the New York Court of Appeals, the Court reluctantly holds that Plaintiff cannot sustain her claim for IIED.

## III.  CONCLUSION

For the reasons stated above, Defendants' Motion For Summary Judgment is granted in part and denied in part.  Specifically, Defendants' Motion is granted as to Plaintiff's § 1983 claim against Harris, the claim for conspiracy under § 1985(3), and the IIED claim.  Defendants' Motion is denied as to Plaintiff's § 1983 claim against the City and Miller, and as to Plaintiff's claims for retaliation under Title VII and NYSHRL.  The Clerk of the Court is respectfully

---

[10] In considering whether the defendants were entitled to judgment as a matter of law as to the plaintiff's claim for IIED based on workplace sexual harrassment, the Second Department has held that "the defendants established their prima facie entitlement to judgment as a matter of law, and the plaintiff failed to raise a triable issue of fact in opposition."  *Nelson v. Vigorito*, 994 N.Y.S.2d 649, 651 (App. Div. 2014) (citing *Conde*, 792 N.Y.S.2d at 387; *McIntyre*, 682 N.Y.S.2d at 167).  The Court in *Nelson* did not explain its holding further.  On the one hand, citation to the First Department's decisions in *Conde* and *McIntyre*, described above, suggests that the Second Department agreed with the First Department's holding that a claim for IIED cannot stand if the conduct at issue is covered by a statute.  On the other hand, the Second Department's comment that "plaintiff failed to raise a triable issue of fact in opposition" to the defendant's prima facie case, suggests that the Second Department's decision was based on the merits, rather than a determination that the plaintiff failed to state a cause of action for IIED as a matter of law.  In light of the First and Fourth Departments' cases, which provide reasoning as to why a claim for IIED is barred, and the Second Department's citation to *Conde* and *McIntyre*, without further explanation, the Court assumes that the Second Department agrees with the holdings of the First and Fourth Departments.  At the very least, the Second Department has not expressed disagreement with the holdings or reasoning in these cases.

requested to terminate the pending Motion.  (*See* Dkt. No. 27.)

SO ORDERED.

Dated: March 27, 2015
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE